FRANK HOLZEMER v. METROPOLITAN STREET RAILWAY COMPANY, Appellant.

Division Two, July 14, 1914.

1. **NEGLIGENCE: Street Railways: Instructions: Applicable to Issues: Going into Danger.** Where the allegation of negligence in the petition, especially when given the liberal construction to which it is entitled after verdict, is wide enough to embrace the meaning that plaintiff was moving toward the fixed path of defendant's cable car under such circumstances as would cause him to be struck if the gripman did not do certain things about the operation of the car, or give warning of its approach, an instruction which used, as regards the plaintiff's acts, the phrase "going into" a situation of danger, as well as the phrase "in such situation," does not enlarge the issues framed by the petition, and, furthermore, defendant should not be heard to complain in that regard on appeal, after having adopted practically the same theory in one of its own instructions.

2. ———: ———: ———: **Going into Danger: Duty of Gripman.** Where the evidence shows that plaintiff, at a street crossing, started southeastwardly across the parallel tracks of defendant's cable railway, and thus unwittingly turned his back somewhat toward an eastbound car which struck him

after he had crossed the north track, on which a westbound car also was approaching, and from the time he started to cross the tracks the gripman by the use of ordinary care could have seen him, it cannot be said that an instruction that it was the gripman's duty to act when he saw or could have seen the plaintiff going into a situation of danger was erroneous because not supported by the evidence.

3. ————: ————: **Going into Danger: Warning: Question for Jury.** Evidence in an action for damages by one run down by a cable car *held* to show that by the exercise of ordinary care the gripman could have seen plaintiff's danger in time to warn him; and accordingly it was for the jury to say whether the giving of an alarm would have aided in preventing the injury.

4. ————: ————: ————: **Instructions: Duty of Gripman: Presumptions.** Where plaintiff, in plain view (whether seen or not) of the gripman on defendant's eastbound cable car, and unaware of its approach, started to walk diagonally across the tracks at a street crossing while a westbound car also was drawing near, and did in fact cross the north track and get well upon the south track before he was struck and injured by the eastbound car, an instruction was rightly refused which told the jury that even though the gripman saw the plaintiff approaching the track, yet under the law he had the right to assume that plaintiff would stop before he went upon the track, and that the gripman was not required to check or stop the car until there was danger of a collision.

5. **INSTRUCTIONS: Refused: Points Already Covered.** The refusal of instructions requested on points covered by instructions already given is not error.

6. **EVIDENCE: Hypothetical Question: Objection: Appeal.** Appellant's contention that the trial court erred in permitting a physician to answer a hypothetical question which appellant asserts was not based upon all the facts shown by the evidence will not be considered on appeal where it appears that that ground of impropriety was not contained in the objection made at the trial.

7. ————: **Extent of Injuries: Stone Taken from Plaintiff's Face.** Where the extent of plaintiff's injuries was one of the issues in the case, which was tried about two years after the injury complained of, a stone which a witness claimed he took from plaintiff's face immediately after the accident was properly received in evidence. From it the jury could get a more accurate impression of the original extent of the injuries to plaintiff's face.

8. ———: **Experiments: Preliminary Proof: Causal Conditions.**
Before experiments and their results are admissible as proof
it must first be shown that causal conditions and circumstances
were reproduced substantially as at the original happening.

9. ———: **Excluded: Offer of Proof: Appeal.** In order to have
the admissibility of excluded evidence considered on appeal
the party complaining must have made an offer of proof when
objections to the questions were sustained.

10. **APPEAL: Credibility of Witnesses: Taking Case from Jury.**
The credibility of the witnesses is for the jury, and where
in a personal injury action the jury found for plaintiff, whose
case was supported by proof, and the court in overruling de-
fendant's motion for a new trial passed upon the weight of
the evidence, the defendant cannot upon appeal successfully
maintain a contention that the case should have been taken
from the jury for failure of proof because, defendant asserts,
plaintiff's principal witness showed by his own testimony that
he was unworthy of belief.

11. **NEGLIGENCE: Damages: Excessive Verdict.** Where a boiler-
maker 57 years old and in good health, earning over $100 a
month, was struck by defendant's cable car, with the result
that his nose was broken, his right forearm broken in two
places, his skull fractured, his spinal column injured so that
five vertebrae have grown together, and until the time of the
trial, two years after the accident, although he "did not look
sickly," he had been able to do no work and suffered from
partial paralysis of his tongue and of the right side of his
face, it is *held* that an award of $15,000 damages was exces-
sive by $3000.

Appeal from Jackson Circuit Court.—*Hon. Herman
Brumback,* Judge.

AFFIRMED (*conditionally*).

*John H. Lucas* and *C. S. Palmer* for appellant.

(1) Plaintiff's first instruction was erroneous for
two reasons: (a) Because it enlarged the issues
framed by the petition; (b) because it was not justified
by the evidence. The petition charged that it was
the duty of the gripman to act when he saw the plain-
tiff in a situation where he was liable to be run into.

The instruction told the jury it was his duty to act when he saw or could have seen plaintiff "going into a situation," etc. There was no evidence that the gripman could have seen the plaintiff going into a situation of danger until the very instant that he was in danger. There was no evidence that any warning could have been given which might have avoided the accident, and the whole record shows that there was nothing to indicate the necessity of a warning until plaintiff was on the track and that it would then have been unavailing. Heinzle v. Railroad, 182 Mo. 528; Christian v. Insurance Co., 143 Mo. 469; Waddingham v. Hulett, 92 Mo. 528; Abbott v. Railroad, 83 Mo. 278; Wolfe v. Supreme Lodge, 160 Mo. 675; Pace v. Shoe Co., 103 Mo. App. 662. (2) Instruction 3 should have been given without the words in parentheses. They directed the attention of the jury to a duty to give warning, not justified by the evidence and cases cited under point one. (3) Instruction E should have been given. This correctly set out the duty of the gripman to attempt to avoid the injury. The cases cited cover this point. (4) Instruction G, though assuming the burden of possibility instead of ordinary care, should have been given, and it was error to refuse it as no correct instruction was given. (5) Instruction H on the burden of proof was improperly refused. This requested instruction applied the law to the facts pleaded. The instruction on the burden of proof allowed the jury to find any negligence of the gripman, whether pleaded or not. (6) The court erred in allowing the rock said to have been taken from next the face of plaintiff to be introduced as an exhibit. 1 Greenleaf on Ev. (13 Ed.), sec. 52; Horr v. Railroad, 156 Mo. App. 651. (7) The court erred in excluding evidence of an actual test of the distance within which a cable train could have been stopped at the place in question. 2 Wigmore on Evidence, sec. 1385; Byin v. Railroad, 94 Tenn. 352; Riggs v. Railroad, 216 Mo. 327. (8) The

verdict was excessive.   (9)   The peremptory instruc-
tion asked by defendant should have been given.   In
view of all the facts, the court should not have sub-
mitted the case to the jury, when a verdict could be
sustained only on the evidence of the witness, Thorn-
berry, in contradiction to his statement made at the
time of the accident.

*Charles A. Stratton* and *Bird & Pope* for respond-
ent.

(1)   Appellant's first contention fails for two rea-
sons; first, because the words of the petition are sus-
ceptible of a broader meaning than the narrow and
somewhat sour construction that appellant seeks to
place upon them; and second, even if the instruction
is broader than the petition (which we deny), appel-
lant fell into the same rut in its instruction 3, which
the court gave, and it cannot be heard to complain.
It has long been the law in this State that in the con-
struction of a pleading, for the purpose of determining
its effect, its allegations shall be liberally construed
with a view to substantial justice between the parties.
Sec. 1831, R. S. 1909; See v. Cox, 16 Mo. 168; Thomp-
son v. Livery Co., 214 Mo. 491; Lee v. Railroad, 195
Mo. 415; Ackerman v. Green, 195 Mo. 140; Sharp v.
Railroad, 213 Mo. 525.   Also the rule that a pleading
must be construed strictly against the pleader applies
to petitions only before verdict; after verdict in plain-
tiff's favor, a petition is liberally construed.   Oglesby
v. Railroad, 150 Mo. 137; Bank v. Assurance Co., 106
Mo. App. 114; Robinson v. Ins. Co., 105 Mo. App. 567;
Strauss v. Transit Co., 102 Mo. App. 649; Rogers v.
Ins. Co., 93 Mo. App. 24; Burkard v. Rope Co., 217
Mo. 483; Long v. Coal Co., 233 Mo. 713; Ice & Cold
Storage Co. v. Kuhlmann, 238 Mo. 685.   In Gordon v.
Park, 219 Mo. 611, the very point under consideration
here is discussed and the cases reviewed by Judge

GRAVES, and the point is ruled against appellant's contention. To the same effect are: Peterson v. Met. St. Ry., 211 Mo. 520; Graves v. Chapman, 248 Mo. 83; Popineau v. Brick Co., 168 Mo. App. 547; Riggs v. Met. St. Ry., 216 Mo. 304. The second point made by appellant that instruction 1 was not justified by the evidence ignores the testimony given both by the plaintiff's and the defendant's witnesses. Appellant argues on the erroneous theory that there there was no duty cast upon the gripman to sound the warning until plaintiff was prostrate on the track, and that at that time the car was right upon him. It must be remembered that this was appellant's defense and that it had some testimony to that effect, but the testimony of the plaintiff and his witnesses and of some of appellant's witnesses is all the other way. The court correctly instructed the jury that if plaintiff was on or approaching the eastbound track, etc. There was testimony that plaintiff maintained a steady pace from northwest to southeast with his back partly to the approaching car; that he did not see it; that he heard the bell on the westbound car when it was 100 to 150 feet east of him and he looked toward it; that the view of Gurley, gripman of eastbound car of plaintiff, was unobstructed during all the time he was running from 100 to 150 feet, but the fact was, and the jury believed that Gurley was looking away toward the north at a workhouse gang, and rang no bell, until he was right upon the plaintiff. This very question of warning has been before this court many times, and was decided adversely to appellant in the recent case of Ellis v. Met. St. Ry., 234 Mo. 683. (2) Instruction E was improper, under syl. 14 in the Ellis case, 234 Mo. 659: "Where there is evidence tending to show to a reasonably prudent person that the traveler, unconscious of his danger, was apparently intent on continuing his journey on and over the track, an instruction telling the jury that the motorman of the oncoming car had the right

to assume, when he saw the traveler approaching the track, that he would stop and not go on the same, and that he owed no duty to give warning or to either stop or check the car until there was actual danger of a collision, should be refused." (3) Instruction G is inconsistent with instruction 3 asked by the appellant, which correctly declared the law applicable to this case from appellant's viewpoint. (4) Defendant's instruction H was rightly refused. It was held in the Ellis case, supra, that it is not error to refuse an instruction where another given, at appellant's request, covered the same ground. (5) There was nothing improper in exhibiting the stone to the jury to clear up the physical facts with reference to plaintiff's injuries, nor to dispute the testimony of defendant's witness Hickein as to what position plaintiff lay in when under the car after being struck. It has been held in numerous cases in this court that clothing worn by the defendant, or by the prosecuting witness, and weapons found upon or shown to belong to the defendant, are properly admitted as evidence. State v. Long, 209 Mo. 366; State v. Jeffries, 210 Mo. 302; State v. Brannan, 206 Mo. 636; State v. Bartlett, 209 Mo. 403; State v. Sharpless, 212 Mo. 176; State v. Barrington, 198 Mo. 111; Keen v. Railroad, 129 Mo. App. 305. (6) The conclusion is inevitable that the trial court properly declined to allow defendant to introduce the testimony offered of the time actually taken to make an emergency stop at the same place, at the time of the trial, when defendant so signally failed to in any way show the conditions to be the same or that the material facts were precisely duplicated in the offered experiment. (7) Plaintiff's instruction K was rightly refused. One instruction on burden of proof was sufficient. Ellis v. Met. St. Ry., 230 Mo. 660. (8) On the trial of this cause defendant did not offer a syllable of testimony to contradict the medical and other testimony showing how terrible were

plaintiff's injuries. We do not care to repeat the long list of injuries suffered by plaintiff (respondent), but respectfully call attention to the same as fully quoted elsewhere, and we doubt that, after even casually reading the same, the court can recall a case where a man was so badly injured and lived thereafter. A verdict of twice the amount would have been fully justified. We wish to call the attention of the court to a few cases where large verdicts were allowed to stand: Gordon v. Railroad, 222 Mo. 516; Stotler v. Railroad, 200 Mo. 107; Corby v. Telephone Co., 231 Mo. 417; Stoebier v. Transit Co., 203 Mo. 702; Shohoney v. Railroad, 231 Mo. 131; Clark v. Railroad, 234 Mo. 396.

WILLIAMS, C.—Plaintiff, while a pedestrian on one of the public streets in Kansas City, was struck by one of defendant's street cars and injured. This action is to recover damages for said injuries. Upon a second trial of the cause in the circuit court of Jackson county, plaintiff obtained a judgment for fifteen thousand dollars and defendant duly perfected an appeal to this court. That portion of the petition specifying the negligence of defendant was as follows:

"That the injuries to plaintiff, and the damages to plaintiff on account thereof, were caused by the carelessness and negligence of said defendant, in that said gripman and conductor in charge of said cable train failed to keep a proper lookout for persons who were on said street and who were liable to be struck by said train, and ran said train in a careless and negligent manner, and in disregard of the rights of persons on said West Twelfth street, and at or near said Belleview avenue, as aforesaid, and failed to check the speed of or stop said train or warn plaintiff of the approach thereof and thereby avoid running into the plaintiff, when they saw, or by the exercise of ordinary care ought to have seen, that plaintiff was in a

situation where he was liable to be run into by said cable train unless the speed of said train was checked or it was stopped or plaintiff warned of the approach thereof before it collided with plaintiff.''

The answer was a general denial. The accident occurred about noon, December 1, 1908, at the intersection of Belleview avenue and West Twelfth street, Kansas City, Missouri. Twelfth street runs east and west. Upon this street the defendant had a double track and at the place in question there was about a five per cent grade in the street car tracks, being down grade to the west and up grade to the east. The north track was used for westbound or down grade cars and the south track was used for eastbound or up grade cars. Plaintiff was injured by one of the eastbound or up grade cars. The street cars at this place were operated by means of an underground cable which was propelled at a rate of about eight miles an hour by means of a stationary steam engine. The train of cars operated at this place consisted of one grip car and one trail car or coach and each train was in charge of one gripman and a conductor. The grip car was in front. A steel grip attachment extended down from the grip car through a slot or opening between the rails of the tracks and connected with said underground cable. This grip was operated by the gripman by means of a lever in the grip car. The car would be moved forward by the gripman causing the grip or clutch to fasten onto the underground cable, which would cause the car to move at the same rate of speed as the underground cable. The cars were stopped by releasing this grip and applying brakes. The train was equipped with two brakes, one a ratchet brake which operated on the wheels of the grip car and the other an automatic brake which operated on the wheels of the trail coach. The ratchet brake would begin to operate as soon as applied but the automatic brake would not begin to operate until four or five feet of

slack was taken out of the chain. Just prior to the accident the situation was as follows: Defendant, coming from the north, started diagonally to the southeast across the tracks. At this time a westbound car was between one hundred and one hundred and fifty feet to the east of the plaintiff and the up grade or eastbound car which afterwards struck him was coming up the grade between fifty and ninety feet to the west of plaintiff. Plaintiff's testimony as to how the accident occurred was as follows:

"I was traveling east, diagonally over Twelfth street, and I crossed over the north track, or just before I got to the north track I seen a car coming down hill. When I got between the north and the south track, my foot slipped and I fell down on the south track, and before I could get up the car was over me. I didn't see this car coming. At the time the car struck me I was trying to get up. I think I was on my hands and knees. When the car passed over me I made a grab at something underneath the car to try and hold myself free from the pavement, and I couldn't keep myself up. I could feel my bones break in there, in the arm, and also my face being crushed on the pavement—about five or six seconds after I was struck, judge. Don't know how long I was able to hold on; seemed a long time. Held up as well as I could for that length of time, but could not hold myself up until the car stopped. At that time was pretty strong for my age and size. . . . I fell while I was between the two tracks. My foot slipped as I was walking along. I don't know what it slipped on. I fell forward onto the south track and down on my hands and knees—from the north over to the south track. I fell when I was between the north and south tracks—forward; expect I almost caught myself, fell half way over the track. About the middle of my body across the north rail of the south track, and while in that position this car ran over me. Think I fell in the direc-

tion I was going—southeast diagonally across these tracks—I naturally must have fell in that direction I was going. I was going southeast. . . . From the time I fell and before I had time to get up the car ran over me. Don't know how far the car was away when I fell. Had never seen the car at all.''

A man by the name of Thornberry was the conductor and a man by the name of Hickein was the gripman on the westbound or down grade car. A man by the name of Gurley was the gripman in charge of the eastbound car which struck the plaintiff. Said Thornberry, who was not working for the defendant company at the time of the trial, testified that the accident occurred as follows:

''I live at Sedalia, Missouri; have been since I was six. Worked as conductor for the Metropolitan Street Railway Company, December 1, 1908. Saw Mr. Holzemer when he was struck by the oncoming car. I was on the grip car of the train going west on Twelfth. I was conductor, out there collecting fares. The gripman was S. R. Hickein. When I first saw Mr. Holzemer he was coming from the north across the tracks in a southeast direction, crossed our tracks and was in the clear, and I didn't pay any more attention to him at that time. When I last saw him he was on his hands and knees on the south track. At that time the upcoming car, I guess, was probably fifteen or eighteen feet from him. When I saw him in that position I hollered at Gurley, the gripman on the other car. I judge that other car went about fifteen feet and maybe more after its struck Holzemen; all of that. There was no decrease in the speed of the car there that I could notice from the time I first noticed and hollered at Gurley until Holzemer was struck. The speed of the road there is eight miles an hour. I had been conductor there the last time fifteen or eighteen months. Never worked as a regular gripman, but had gripped some—at nights—just a trip or so every night.

Have had occasion to stop a grip car coming up that grade, one night when a milk wagon had backed on the track, and we were in twelve or ten feet of this wagon and I stopped the car then. That was right at the top of the incline, about the same place where Mr. Holzemer was struck—I don't know whether that is called Belleview or Lincoln. The street is not cut through to the south. Travel coming up the hill crossed Twelfth street diagonally as a rule. I had gripped a trip or two at night ever since I have been over there; understood the appliances for stopping the car. They were ratchet brake and automatic brake. The ratchet brake was on the left-hand side of the grip. It works on the grip car wheel. The automatic brake works on the coach; that is on the right-hand side of the grip lever. The up-hill car, Gurley's car, had a seated load; I should judge forty or more passengers. The car stops quicker with a heavy load. . . . Q. Now, when you saw Holzemer clear your track when you first saw him there, how far was your car from him then? A. Well, it must have been nearly 100 feet or closer, probably, east of him.

"My car was sixty-five or seventy feet from him when I saw him the second time on his hands and knees. I was collecting fares from passengers on the grip. At the time the chain gang from the workhouse was working on the street going down the bluff—right north of Twelfth street. Don't know how far along the road they were working. Think that is Kersey Coates Terrace roadway. When I saw Gurley I noticed the people in the grip car there. They were looking north, and Gurley was looking north. This chain gang was north of him. When my down train stopped I got off the grip car and went around this coach where Holzemer was laying under the grip car, with his head to the middle of the track, to the north, his knees down south of the south track. He was underneath the front part, the fender. The wooden fender

was right over his forehead right along there (indicating), through the right part of his face, head wedged down against the cobblestones.''

There was evidence offered by plaintiff tending to show that the bell or gong on the eastbound car was not sounded by the gripman as the car approached the scene of the accident. Plaintiff's evidence tended to show that street cars coming up this up grade with a load of passengers and the conditions similar to those under which the cars in question were being operated on the day of the accident could be stopped by the gripman in a distance of less than fifteen feet. Some of the witnesses putting the distance at six feet, others at eight and some at ten and twelve feet. Plaintiff was fifty-seven years old at the time of the injury. His occupation was that of boiler maker and he worked for the Missouri Pacific Railway Company at Marquette, Kansas, and had come to Kansas City from his home in Kansas the day before he received this injury. At the time of the injury he was earning from one hundred dollars to one hundred and seven dollars per month and weighed one hundred and thirty-nine pounds and was in good health. Since a question is raised as to the excessiveness of the verdict, it becomes necessary to state somewhat in detail the evidence concerning plaintiff's injuries. The evidence concerning the injuries received was uncontradicted. Plaintiff testified concerning his injuries as follows:

''Was at the hospital there from December 1, 1908, to January 26, 1909. . . . I got back to Marquette on the 5th day of May, 1909, and went back to work for the Missouri Pacific on the 11th day of May, 1909. I was working on engines, calking leaks, and putting staybolts in and such like. It was hard, hot work. When I would get in the engine my head just seemed as though it would swell up. I was getting dizzy. Also my arm was so weak that I couldn't do the work right. The wipeman, Fred Sharkey, helped me do that work.

Didn't work longer than a week, because I was not able to do the work; couldn't stand it. Done no work since. Wasn't able to work. I was struck down on my face, down along, in here (indicating right side of face), through here (indicating) and down through here, at my nose, it was broken and my teeth were knocked out. I was cut on here (indicating); my right eye was injured. I was bruised in through here (indicating chest) some, both broken here in the vertebrae, the third vertebra, the spinal column, the doctor called it. My right arm was broken in two places, hurt down around the chest, in through my back and right shoulder. Don't know how big a cut that was around my right eye. My face was split open. My head was all bandaged up and I couldn't say how big it was. Must have been cut way in, my face was laid open. Jaw was broken (indicating right side of head). . . . Think my jaw had to be wired up to hold it together. Don't remember when they put the wires in. . . . Something wrong in back there. I can't move my head as I should, and if I go to sleep I lay in bed a couple of hours or more before I know which way to get my head to get to sleep, keep moving around, and finally, then, it seems like though it gets numb and I drop off to sleep.

"Am bothered with headache now in here (indicating top of head). Seems always a kind of whirling noise, humming like. Pain in the top of the head. Headache generally lasts about an hour; sometimes half a day. . . . This injury in my back, neck, the bones thickened out, whatever it is, I don't know. Yes, you can feel it (witness exhibits his neck to the jury, having taken off his collar and tie).

"The Court: Let each juror put his hand on the place there, so he can know, so that all have the same knowledge. (Jurors do so.)

"Did not have that lump there in my spinal column before I was hurt. Was cut through on the upper

lip, through there and through here (indicating), I guess just as far as the jaw. Nose was broken right here (indicating). Bothers me now. I can't breathe very well through it at the right nostril. Notice that as soon as I got the bandages off my face. The cut near my right eye hurts the eye. I can't see very good with the eye, and there are times when it seems like though there was a needle run in, comes down kind of sudden like. Can't see to read very much out of that right eye. Looks like two or three lines where there is only one line. Eyesight was good before I got hurt. Am a little hard of hearing. Boilermakers generally are. I could hear 'most anything at that time, but now I cannot hear a thing out of the left ear. Don't know how many teeth I lost. Before I was injured I had 'most all my teeth with the exception of two or three. While in the hospital they fed me with a little dish with a pitcher-like spout which I put in my mouth —kind of like soup. Guess I was fed on that about a week and a half or two weeks. My head was so bandaged up, they always kept all these bandages on so I couldn't open my mouth and they had to feed me that way. The loss of my teeth bother me now in eating. Can't chew anything. My teeth lap over; they don't come down on one another so that I can bite them. Can't chew beefsteak, meat. Was fond of meat before. Don't know whether my face was bruised. For a long time it seemed as though there was a weight pressing down on top of my head. Whilst I was in the hospital I would try to look up and see who was pressing on my head and there was nobody there pressing it. At times feel a sensation like that now, maybe once a month; maybe sometimes oftener. Have no strength in my right arm. I know it because I can't use a hammer. Can't use nothing. It is weak. My arm was broken here at the wrist and also in around here (indicating part of lower arm). About where the arm was broken when I was a school boy is here (above

the elbow). Back was hurt up around near the shoulder, between the shoulders. Noticed it hurting me during the week I worked at Marquette, from the shoulders over in there and around the chest. Chest hurts me now in here (indicating); feels bruised and sore-like all the time. Feels numb from the shoulder down to the arm here at times—maybe about every day; especially if I am walking a little ways, it seems as if there was some little weight pulling down here as though it was heavy (indicating arm). Can't grip anything very hard in my right hand. Hammer handle keeps turning around in my hand. Professor Schwartz at Fort Scott treated me there for about a month, masseur treatment. That helped me. Before he treated me I couldn't move my arm any way, and my hand stood out like that so I couldn't close my fingers at all. He treated me for my back and arm, and it got so I could close my hand. Was injured on my right leg above the ankle, in here (indicating). There was some flesh torn out there almost two inches square or round, and it was bruised.''

Dr. Neal, the acting superintendent of the general hospital, who attended plaintiff when he was brought there for treatment on December 1, 1908, described the plaintiff's injuries as follows:

''He had some lacerations about the face, was bloody and dirty from evident contact with the dirt on the street, or something of that kind. I found he had a fracture of the jaw and cheek-bone, double fracture of the forearm, and wounds on the face, on the chin and on the cheek. We surgically cleaned the wounds. There was a fracture of the nose and, as I recall it, there was a linear fracture extending across the temple into the skull, from this wound which laid open the cheek up into the eyebrow. These wounds were surgically cleaned and sutured; that is, sewed up, with drainage; and the fracture of the arm reduced. The man was put to bed; remained there probably seven

or eight weeks. I had general supervision of his treatment. My two assistants, Dr. Bates, who carried out most of the treatment, and Dr. English, were also on the surgical service at that time. Dr. Bates is now at Adrian, Missouri, about sixty or sixty-five miles from here. Dr. English, the last I knew of him, was one of the assistant physicians at the tuberculosis sanitarium at Mt. Vernon, Missouri. I examined the plaintiff on the 23rd of this month. Was present at the making of the X-ray picture, helped place Mr. Holzemer in the position that would show the injury to the neck. Have had some little experience with the making of those plates, and can read them to my own satisfaction, at least. Without reference to the plates, I felt around this cervical vertebra for evidence of injury there, and found there was a part of a cervical vertebra there in which there was no motion between the individual bones, and then they were fused or grown together, healed together in some way. The X-ray picture shows the condition present under those circumstances and the various bones as they are. Don't recall that he complained of any injury to his neck when he was brought into the hospital. I thought that the man could not live but a few hours. He was in bad condition mentally and physically. I couldn't say how long it was before he was able to give any clear connected statement.''

The doctor then exhibited to the jury the X-ray plates showing the injury to the bones of the spinal column. The doctor also testified that he made an examination of the plaintiff about two years after the date of the injury and found the following conditions existing:

''I found that he had a healed fracture of the nose, of both nasal bones and the septum of the nose, with depression of the bridge. The septum of the nose is deviated to the right, almost closing the right nostril. The point of the nose is also deviated to the right. The

septum is the middle bone and cartilage which separate the two nostrils. I found a scar or lacerated wound extending from the nasolabial fold, which extends from the nose down to the corner of the mouth, extending on the right side upward outward irregularly to the corner of the right eye. Then upward and inward from that up to a point directly above the center of the upper lip, scar adherent to the malar or cheek-bone, and also to the upper maxillary or jaw-bone. The malar or cheek-bone presents evidence of healed fracture. It is depressed, displaced, and the *service* (surface) is very irregular. The lower lid of the right eye is drawn downward and outward by the above described scar. The outer portion of the lower right lid is averted, that is, turned outward, showing the red mucous membrane. Unable to fully close the right eye on account of the contraction of the lid. Tears slightly overflow on the face. Healed scar of lacerated wound extending from the center of the lower lip outward to a point three-quarters of an inch below the left corner of the mouth, and thence irregularly downward and inward under the point of the chin to a point one and one-half inches below the right corner of the mouth. A scar adherent to the jaw-bone, and the jaw-bone, a palpable deficiency in the jaw-bone on the right side at the point of the chin at the seat of old fracture. Only two teeth remain in the upper right jaw; the other six are missing. The upper right lateral and incisor— that is, the second ones from the center, and canine teeth; the teeth are broken off flush with the gum. The other four are entirely missing. Then the two molar or back teeth are missing in the lower right jaw and the same in the left. The remaining teeth in the upper and lower jaw do not articulate accurately. That is, I mean they do not come together as they should on account of the fracture of the jaw. Some paralysis of the face muscles on the right side. Unable to pucker lips. Right corner of mouth drooped to a considerable

extent. Unable to fully protrude tongue on account of above paralysis. Tongue when protruded as far as possible falls to the right. Speech seems thick and uncertain, and slightly halting. Has some difficulty in pronouncing some sounds of words containing 's,' 't,' and 'th.' Seems to have been entirely deaf in the right ear; partly so in the left. An old fracture of the right elbow of many years' standing. Healed fracture of the right ulna. Healed fracture of the right radius at the middle of the bone. That would be about the middle of this outer bone of the arm (indicating). Right forearm much smaller than the left, showing by the following circumstances: circumference of wrist, right, 6 inches; left 6½; circumference of forearm five inches above the wrist, right 7½, left 8; slight deviation of the axis of the eyes, that is, the line sight of the two eyes is not exactly parallel. Neck and spine, lateral curvature of the spine with convexity to the right extending from about eighth dorsal, that is, about the middle of the chest, up to the second cervical vertebra from the skull. Unable to fully flex head either anteriorly, posteriorly or laterally; that is, he cannot throw his head forward or back or far to either side, as far as a normal man can. Found great difficulty either when he was remaining passive or flexing it himself, either active or passive motion. There is evidence of injury to all the cervical vertebrae except the first. All the cervical vertebrae from the second to the seventh inclusive are fused together and move as one bone. All the bones in this region surrounding the spinal canal are fused together. His thickness of speech comes from his inability to protrude the lips and tongue as a normal man does. There is some slight paralysis of the lips, slight paralysis of the tongue, which could come from these injuries. The right arm is smaller than the left. Normally it should be as large. Assuming

plaintiff is weaker now than he was before he was injured, that could be the probable and natural result of his injury. With the amount of injury which was shown in the vertebrae there, there must be some interference with his nerve supply to his arm, of course. His nervous system at the time of this injury received a distinctly severe shock, and that probably remains with him at the present time. Those bony injuries are permanent injuries. In my opinion the paralysis is permanent. It has been going now for two years."

On cross-examination the doctor further testified: "He was pretty badly bunged up when they brought him out there. I thought then it was very questionable whether he would recover. I examined him and found these broken bones, and set them, or it was done under my direction. He unquestionably received proper treatment. He responded to the treatment. I did not expect him to recover. Made as thorough examination at the time as his condition would permit. Don't recall that I found any dislocation of his neck or bones in his neck at the time. If I found a dislocation of the neck, I might have done something for it or might have let it run, depending largely upon the symptoms. There were no symptoms at the time pointing to anything wrong with the neck, that I recall. The two places on his arm that were broken were set either by myself or Dr. Bates under my direction. They grew together in fairly good position; don't think I would like to say it is as strong as it ever was. His arm is in pretty good shape for a man who had his arm broken in two places. The union is permanent. The fracture of the nose has entirely healed. Lower jaw bone was broken in one place and there was a fracture extending into the upper. Those have healed in fairly good shape, but he has not his teeth; they don't articulate properly, I think from the position in which the jaw has healed. They healed

fairly well in the position in which the bones were set.

"Q. Now outside of Mr. Holzemer being disfigured in appearance, there is not anything so very much wrong with him, to-day, is there? A. Yes, sir, there is. That fusing together of the bones of the neck is a matter which I would consider a very serious matter had I had it myself. Outside of that there is difficulty in talking, partial paralysis of the tongue, and the few teeth remaining do not properly articulate, which must be very inconvenient. Gets around pretty well for a man fifty-nine years of age; seems to have no great difficulty in locomotion. Does not look sickly. Outside of his injuries I should say he is a very good man—outside of all his injuries together."

The evidence on the part of the defendant tended to show that the bell or gong was sounded on the eastbound car as it approached the scene of the accident and that it would take from twenty to thirty feet to stop the car under the conditions existing at the time of the accident. Some of defendant's witnesses testified that if the car was on a level place and the grip was released from the cable and no brakes applied the car would move fifty-five or sixty-five feet before it would come to a stop. S. R. Hickein, who was the gripman on the down grade car near the scene of the accident, testified that the accident occurred as follows:

"When the accident happened I was going west down the hill at Twelfth and Summit. Thornberry was my conductor. . . . When I first saw Holzemer he was on the westbound track, about Belleview, the north track on which our car was running. When I first saw him he was standing on the north side of the north track, and I rung my bell, and he looked up and started across the track, and he kept in between the two tracks for a minute, and then he stepped right in front of this other car coming up the hill; it was right up to him—within two or three feet of him. Before

the car struck him he got about to the center of the track, about over the steel (slot) rail. He didn't fall at any time there until after this car struck. After it struck him and stopped I stopped my car right beside of it. The front end of my grip car was right even with the back end of his coach. I got off and went around the car to help the man that was hurt. He was lying on his back with his feet to the northeast, his head to the southwest, with his head back, the back of his head on the rail; the fender of the grip car made of oak boards resting right across his face.''

On cross-examination he further testified:

''When I saw Holzemer he was right on the north side of the north track, not over a couple of feet from the north rail. He was looking to the west, towards the depot. I rang my bell and he turned and looked towards my car. When I rang, my car was about 100 or 150 feet from him. That is as near as I can say. I rang to warn him of danger, as was my duty. I did not see him until that time. He was then standing still looking towards the west. He started south almost as soon as I could commence to ring the bell—stepped across the track. . . . He glanced at me, commenced moving towards the south, got about in between the two tracks, hesitated, and then stepped right in front of the other car. He stopped just an instant in between the two tracks; I couldn't say whether he was nearer the north or south track. I was then about seventy-five feet from him, and began to set my brakes and ring the bell. He stopped there just momentarily and went right on. If I hadn't been watching I couldn't have told he stopped at all. Stepped over, hesitated and then went right on. Gurley was away two or three feet from him when he took a step. I didn't measure it; I just judged by the time it hit him. He couldn't have been over a foot or so from the south track when he made that step. The distance between these two rails is four feet I believe. I judge

he was about a foot from the south track when he stepped over, by the time from the time he moved until the car hit him. When Holzemer did step, Gurley's car was going about eight miles an hour, and Holzemer was hit almost instantly as he got on the track. He stumbled over the drawhead of the grip car and fell over on the track and we found him with his head on the south rail. His feet were on the slot rail between the two running rails. The fender was on his face, the part of it that reached over the south rail. . . . When I rang my bell for this man, Gurley's car was then twenty-five or thirty feet west of Holzemer. When I first saw this man I didn't notice Gurley's car at all. Didn't notice it until he started to walk south. Just noticed Gurley's car when he made the first step. The car was then twenty-five or thirty feet from the point of collision; and when he got in between the two tracks Gurley's car was then about ten to fifteen feet; and when, after hesitating, he stepped on the track the car was right again him. He did get on to the track before the car hit him. That car, without any one under it, couldn't be stopped under twenty-five or thirty feet. Holzemer was dragged about eight feet. Before Holzemer made any step, and Gurley's car was two or three feet from him I saw Gurley ringing his bell. He applied his brake about the time that he hit him.''

S. L. Witton, a passenger on the eastbound car at the time of the accident, testified as follows:

''I was on the eastbound car that struck Mr. Holzemer at Twelfth and Belleview coming up the incline there, sitting on the front seat of the grip car on the south side. When I first saw Mr. Holzemer he was north of the north track. I judge our car was then about ninety or 100 feet west of him. He was about ten feet north of the north track and I watched him until he stepped on the north track. Then I taken my eyes off of him and looked back and the car was strik-

ing him. I just throwed my eyes across the street south. At that time, the last time before the car struck him, I would judge he was fifty feet or more from the car. Then the last time I looked I seen a man—I don't know whether it was him or not—I seen a man struck and stepped in front of the car. I don't know how far we were away when he stepped in front but I looked around just as the car struck him. He was just about half way, I would judge he would be, from what we call the center of the car to the north side. With reference to the north rail of that track I would judge he was about two feet over on the track.

"Q. . . . Was he down on his hands and knees, or was he up? A. He was up.

"He fell to the south. He seemed to catch—I couldn't tell you what he caught on. He went down past my view then. I jumped off. There certainly was a bell rung on the car as he came up there. This man that was struck was not down on his hands and knees when our car was fifteen or twenty feet away."

On cross-examination, he further testified:

"When I took my eyes off the man he was on the north track, I would judge just about the center. He was heading southeast and kept going all the time I could see him. Did not at any time see him look west. When I took my eyes off him, when he was in the center of the track I guess our car was fifty or sixty feet from him. At that time he was walking towards the track and just about the center of the north track, I would guess. When I looked again the car was striking the man. I saw he had his hand up."

Mr. Gurley, the gripman in charge of the car that struck plaintiff, did not testify. M. M. Powers testified that he saw the accident; that at the time he was standing about twenty-five feet north of the place where the accident occurred. His testimony was as follows:

"When I first saw Mr. Holzemer he was right in front of the car—a little bit to the north side of the

center of the car.  He was leaning forward with his hands throwed up a little bit.  He had his hands throwed just like fixing to fall.  It was done so quick I couldn't tell how far the car was away from him at that time.  He was standing up; he was not down on his hands and knees in front of the car that I seen.

"Q.  Did the car strike him just after you saw him?  A.  It would have been just the second before or right at that instant, I don't know.  He was just leaning like he was falling.  He was falling at that time, a little bit to the southeast.  Then he was struck and went on the ground.  Was drug about six or eight feet."

Defendant's testimony showed that the gage of the street car tracks at that place was four feet, eight and one-half inches and that the distance between the two rails was four feet, seven inches.

Instruction 1 given on behalf of plaintiff was as follows:

"The court instructs the jury that it was the duty of the gripman, in charge of the eastbound cable train mentioned in the evidence, to exercise the care of a reasonably prudent gripman, to keep a reasonably vigilant lookout ahead for persons on or approaching the eastbound track upon which said cable train was running.  If therefore you believe and find from the evidence that on or about December 1, 1908, and at about the hour of twelve o'clock noon, on said day, the plaintiff was walking southeast on West Twelfth street, in Kansas City, Missouri, and was crossing the tracks of said defendant at or near Belleview avenue and said West Twelfth street, and that said West Twelfth street was a public street and thoroughfare of said Kansas City, Jackson county, Missouri, and that one of the cable trains of the defendant, eastbound, was run into and against the plaintiff and injured him.  And if you further believe and find from the evidence that plaintiff was on or approaching the eastbound track of the

defendant at or near said Belleview avenue and West Twelfth street, and that by reason of the fact that he was on or approaching said eastbound track, he was in a situation, or was going into a situation where it was reasonably probable that he would be run into by said cable train and injured, unless the speed of said train was checked, or it was stopped before it collided with him, and that the gripman in charge of said eastbound train saw, or by exercising the care of a reasonably prudent gripman, under the circumstances, would have seen that plaintiff was in a situation, or was going into a situation where a reasonably prudent gripman would have concluded that it was reasonably probable that plaintiff would be run into by said cable train and injured unless the speed of said train was checked, or it was stopped, or plaintiff was warned of the approach of said train before it collided with the plaintiff. And if you further believe and find from the evidence that said gripman in charge of said eastbound train saw (if you find he did see), or by exercising the care of a reasonably prudent gripman, under the circumstances, would have seen (if you find that by exercising such care he would have seen), that plaintiff was in a situation, or was going into a situation where a reasonably prudent gripman would have concluded that it was reasonably probable that plaintiff would be run into by said cable train unless the speed of said train was checked, or it was stopped before it collided with the plaintiff, and could, thereafter, by exercising the care of a reasonably prudent gripman, under the circumstances, and with due regard to the safety of the people on said cable train, have checked the speed of said car, or stopped the same or warned the plaintiff of the approach of said train before it collided with the plaintiff, and thereby could have avoided colliding with and injuring the plaintiff, and failed to do so, then the defendant was negligent. And if you further believe and find from the evidence that said negligence

(if any) of the defendant caused the injuries (if any) to the plaintiff, then you will find for the plaintiff, and assess his damages (if any) at such sum as the evidence shows is a full, fair and just compensation for the injuries (if any) sustained by him, considering their nature and character as shown by the evidence, not exceeding, however, the sum of twenty-five thousand dollars ($25,000) the amount claimed in plaintiff's amended petition, although you may further believe and find from the evidence that plaintiff was negligent, or did not exercise the care of an ordinarily prudent person under the circumstances, in crossing the tracks of the defendant without looking or listening for, or becoming aware of the approach of, the cable train that collided with him.''

Defendant's given instruction 2, was as follows:

''The court instructs the jury that the burden of proof is on the plaintiff to prove to your reasonable satisfaction by the preponderance or greater weight of the credible testimony that the gripman was guilty of negligence; and unless you believe and find from the evidence in the case that the plaintiff has proved by a preponderance of the credible testimony, to your reasonable satisfaction that the gripman was guilty of negligence, and that such negligence was the direct cause of injury complained of, then your verdict must be for the defendant.''

Defendant's given instruction 3 (the portion in parentheses having been inserted by the court over the objection of defendant) was as follows:

''The court instructs the jury that even though you might believe and find from the evidence that the gripman operating the car saw the plaintiff approaching the eastbound track, yet under the law the gripman was not required to begin to stop his car or to check or slacken the speed of same until he saw, or by the exercise of ordinary care could have seen that the plaintiff was not going to stop before he got into a position of

peril, and you are instructed that if you find and believe from the evidence that the gripman could not by the exercise of ordinary care prevent the accident (by stopping the car or checking or slackening the speed of the same or by warning the plaintiff) after he saw or by the exercise of ordinary care could have seen that the plaintiff was not going to stop before he got in a position of peril, your verdict must be for the defendant.''

I.    Appellant contends that plaintiff's instruction 1 was erroneous: (1) because it enlarged the issues framed by the petition; (2) because it was not justified by the evidence.

With reference to the first objection, appellant insists that the use in the instruction of the phrase ''going into situation'' instead of the phrase

Negligence:
Going into
Danger:
Street
Railways.

''in a situation'' as alleged in the petition amounted to an enlargement of the negligence alleged. We are unable to agree with this contention. It will be noticed that both in the petition and in the instruction the ''situation'' in which plaintiff is required to be before the defendant is required to act, is one which, if it continued to exist, coupled with the failure of defendant to do certain specified acts, will result in plaintiff being struck by the car. The allegation of negligence in the petition, especially when given the liberal construction to which it is entitled after verdict    (Sharp v. Railroad, 213 Mo. 517, l. c. 525-526), is sufficient in scope to embrace the meaning that plaintiff was moving toward the fixed path of the street car in such a manner and under such surrounding circumstances as would cause him to be struck by the car if the gripman did not do certain things with reference to the operation of the car or give a warning of the car's approach. Furthermore, appellant should not now be heard to complain in the above regard, since it adopted

practically the same theory in its instruction 3, wherein the gripman is not required to act "until he saw, or by the exercise of ordinary care could have seen that the plaintiff *was not going to stop before he got into a position of peril.*" [Gordon v. Park, 219 Mo. 600, l. c. 612, and cases therein cited.]

In support of the second objection to said instruction appellant contends that there was no evidence that the gripman could have seen the plaintiff going into a situation of danger. It is a sufficient answer to this to say that the evidence shows that plaintiff coming from the north started across the double tracks of defendant in a southeasterly direction, unaware of the approach of the eastbound car. This would throw his back somewhat towards the eastbound car. A westbound car was also approaching the crossing. It is very doubtful if there was sufficient space between the two tracks to allow a pedestrian to stand between two passing cars. At the time plaintiff started across the tracks he was within plain view of the gripman on the eastbound car. And had the gripman been looking ahead he could have seen plaintiff in the above situation and could have seen him crossing the north track to avoid the westbound car and therefore could have reasonably anticipated that plaintiff would come within the danger of the eastbound car, if it was not slackened or stopped, or the plaintiff given some warning of its approach so that he would wait until it had passed or, if in a position where he could not wait by reason of the other car approaching him from the east, to have caused him to have put forth an extra effort to clear the eastbound car.

Duty of Gripman.

Appellant further contends that "there was no evidence that any warning could have been given which might have avoided the accident." In support of this contention, appellant cites the case of Heinzle v. Railroad, 182 Mo. 528. But

Warning.

the facts in that case clearly distinguish it from the present case. In the Heinzle case the evidence shows that the motorman in charge of the car did not see and could not have seen the little girl until she ran out from behind another car, within a very few feet of the oncoming car and too close to the car to have been saved by any action upon the part of the motorman after he could have seen her. But in the present case, the gripman's view was unobstructed and he could have seen the plaintiff approaching the danger, unaware, had the gripman been in the exercise of proper care upon his part. Under the situation **Question for Jury.** it was for the jury to say whether the giving of an alarm would have aided in preventing the injury. [Cytron v. Transit Company, 205 Mo. 692; Ellis v. Met. Street Ry. Co., 234 Mo. 657, l. c. 683.]

II. Appellant further contends that the court erred in refusing its instructions "E," "G," "H," and "K." Instruction "E" told the jury that even though the gripman saw plaintiff approaching the track, yet under the law he **Instructions.** had the right to assume that the plaintiff would stop before he went upon the track and that the gripman was not required to check or stop the car until there was danger of a collision. Under the evidence in this case, instruction "E" was properly refused. [Ellis v. Met. Street Ry. Co., supra, l. c. 681.] The correct theory applicable to the evidence in the present case is contained in appellant's given instruction 3.

Instruction "G" was as follows: "The court instructs the jury if you find and believe from the evidence that at the time that the plaintiff got into a position of peril that the car was then so close to him that it was impossible for the gripman to avoid the accident, plaintiff is not entitled to recover in this action, and your verdict must be for the defendant."

The court did not err in refusing this instruc-
tion, because the law applicable to the

**Refusal:**
**Points**
**Already**
**Covered.**
points attempted to be covered by said in-
struction had already been properly set
forth in plaintiff's instruction 3 above
mentioned.

Instructions "H" and "K" were on the question
of burden of proof. This point was properly covered
by appellant's instruction 2 which was given by the
court, and the refusal of these instructions did not
constitute error.

III.   The action of the court in admitting certain
evidence is assigned as error.   Under this point it is

**Hypothetical**
**Question:**
**Insufficient**
**Objection.**
claimed that the court erred in permitting
Dr. Neal to answer a certain hypothetical
question because the question asked was
not based upon all the facts shown by the
evidence.   With regard to this point it is
sufficient to say that the reason or ground now given
by appellant as to why the question was improper
was not contained in the objection made to the ques-
tion at the trial.

It is further contended that "the court erred in
allowing the rock said to have been taken from the

**Evidence: Stone**
**Removed from**
**Face of**
**Injured Man.**
face of plaintiff to be introduced as
an exhibit."   The introduction of
this evidence occurred in the follow-
ing way.   Witness Russell testified
that he helped take plaintiff out from
under the car.   That portion of his evidence concern-
ing the rock was as follows:

"After we got him up I saw a stone in his face
and I pulled it out, right there through the jaw.

"Q.   Now is that the rock you saw there?

"The Court:   Wait a moment.   Do not show that
outside of the paper.

"Mr. Bird: Just state whether or not that is the rock? A. Yes, sir, that is the rock.

"Q. And whereabouts, now, on Holzemer did you find this rock?

"Mr. Page: I object to that as immaterial, and not proving or tending to prove any allegations of negligence contained in the plaintiff's petition.

"The Court: It is not intended to prove negligence, I presume; but as bearing on the injuries. I presume that is what it was for. Go ahead.

"To which defendants duly saved its exception.

"I took that out of the jaw; right by the side of his jaw there (indicating).

"Mr. Bird: We offer that in evidence.

"Objected to by defendant for the reason that it does not prove or tend to prove any allegation contained in plaintiff's petition.

"Objection overruled; to which defendant duly saved its exception."

The trial occurred about two years after the date upon which plaintiff received the injuries and the wounds on his face had undoubtedly healed much in that time. The introduction of the stone which the witness claims to have pulled from the face or jaw of the plaintiff just after the injury would enable the jury to get a more accurate impression of the original extent of that portion of his injuries. The extent of plaintiff's injuries was one of the issues in the case and therefore the above evidence was properly admitted.

IV. It is next contended that "the court erred in excluding evidence of an actual test of the distance within which a cable train could have been stopped

Evidence of Experiments: Preliminary Proof.

at the place in question." Two of defendant's witnesses were asked if they had seen "an emergency stop made there this morning," and further asked "within

what distance was the car stopped." To these questions plaintiff's counsel objected. The court sustained the objections and the defendant excepted to the ruling of the court. In the case of Riggs v. Railroad, 216 Mo. 304, the rule with regard to receiving evidence of experiments and their results was stated by LAMM, P. J., as follows: "We find no fault with plaintiff's proposition of law, viz.: that experiments and their results are admissible proof when it is first shown that *causal* conditions and circumstances are substantially reproduced at the experiments." Under the above rule the questions asked did not lay a proper foundation for the introduction of the evidence showing the result to be of the experiments which were claimed to have been made. Furthermore, when the court sustained the objection to the question, appellant did not make an offer of proof setting out what the testimony of the witnesses would be if permitted to testify in that regard and for that reason, even though the question had been properly propounded, we would still be unable to determine whether or not the exclusion of the testimony constituted error. [Copper & Iron Mfg. Co. v. Manufacturers' Ry. Co., 230 Mo. 59, l. c. 77; Shelby County Ry. Co. v. Dimmitt, 235 Mo. 489, l. c. 492.]

**Excluded Evidence: Offer of Proof.**

V. It is further contended that appellant's peremptory instruction requested at the close of the case should have been given. In support of this proposition appellant does not contend that there was a failure of proof but that the principal witness for plaintiff showed by his own testimony that he was unworthy of belief. The credibility of the respective witnesses was for the jury's determination. In passing upon the motion for a new trial the trial court passed upon the question of the weight of the evidence

**Appeal: Credibility of Witnesses.**

and ruled against appellant's contention. The testimony is not of such character as would justify this court in saying that the court erred in that regard.

VI. It is next contended that the verdict was excessive. After careful consideration we

**Damages: Excessive Verdict.** have reached the conclusion that the verdict is excessive by three thousand dollars.

If, therefore, the plaintiff will, within ten days, enter a remittitur of three thousand dollars as of the date of the judgment in the trial court, the judgment will be affirmed for twelve thousand dollars with interest at six per cent from the date of the judgment in the trial court; otherwise the judgment will be reversed and the cause remanded. *Roy, C.,* concurs.

PER CURIAM.—The foregoing opinion of WILLIAMS, C., is adopted as the opinion of the court. All the judges concur.