J. C. McINNIS v. ST. LOUIS-SOUTHERN, INC., a Corporation, and JOHN OERTLI, Defendants, ST. LOUIS-SOUTHERN, INC., a Corporation, Appellant.—108 S. W. (2d) 113.

Division One, July 30, 1937.

*Thos. J. Cole* for St. Louis-Southern, Inc.

*Eagleton, Waechter, Yost, Elam & Clark* for respondent.

GANTT, J.—Action for personal injuries. An automobile driven by plaintiff collided with a truck owned by John Oertli but driven by him in the service of St. Louis-Southern, Inc. Defendants admitted liability. The issue of damages was submitted to a jury. Judgment for $10,000 and defendant St. Louis-Southern, Inc., appealed.

The evidence for plaintiff tended to show that prior to the collision plaintiff was in good health, except an impairment of his hearing due to catarrhal condition. Plaintiff claimed serious injuries, including injury to ears. Defendant claimed no serious injury. Plaintiff had been treated by Dr. James M. Smith, an ear specialist from May, 1927, to May, 1932. In March, 1932, plaintiff called at Dr. Smith's home for consultation. The doctor was ill and plaintiff consulted Dr. V. V. Wood, another ear specialist. Dr. Wood was not called as a witness. The evidence with reference to treatment of plaintiff's ears follows:

"Q. Who was the first ear specialist you went to? A. Dr. James M. Smith, St. Louis.

"Q. When did you first see him? A. Along five or six years ago.

"Q. How long did you go to him? A. I don't remember. He treated my ears for quite a while.

"Q. Will you tell us the months or years? That is indefinite. A. I don't remember.

"Q. How much did you pay him? A. I don't remember that either.

"Q. Well, what did he finally tell you? A. Sir?

"Q. Did he discharge you and say that you were all right, or

could not be cured, or what? A. He told me my ears would possibly get all right.

"Q. Then what did you do? A. I just left them alone.

"Q. You went home after Dr. Smith told you that? A. Yes, sir. After he treated them a while he told me they would be all right and wouldn't get any worse.

"Q. Then you went home and had no further treatment? A. What?

"Q. Did you have any further treatment? A. No, sir.

"Q. Did you go to any other doctors? A. Yes, sir.

"Q. Who? A. Sir?

"Q. What other doctor did you go to? A. I was talking to Dr. Anderson about it one day, and I asked him if he knew anybody that knew ears.

"Mr. Cole (Q): Did Dr. Anderson examine your ears? A. No, sir. He told me to see a specialist.

"Q. You told him you had been to a specialist, Dr. Smith, did you? A. I asked him if he knew anything about ears, and he said, 'I will tell you a man who will tell you about it.' He said, 'I know the man well, and if you want to go to St. Louis with me, we will see what he says about your ears.'

"Q. How long after Dr. Smith told you to go home did that occur? A. A couple of years.

"Q. After Dr. Smith discharged you your ears were still bothering you? A. No, sir; not bothering.

"Q. But you thought you would go to the doctor for them, anyhow? They were not causing you any trouble? A. What?

"Q. You went to the doctor even though they were not bothering you? A. I was a young man and didn't want to take any chances.

"Q. You went to another doctor that Dr. Anderson recommended? A. Yes, sir.

"Q. Who was that doctor? A. Dr. V. V. Wood.

"Q. Where is his office? A. In the Beaumont Building, Washington Ave.

"Q. Dr. Smith's office is where? A. Grand and Washington, the Humboldt Building.

"Q. Will you have those doctors in court—Drs. Smith and Wood? You intend to have them here to tell the condition of your ears before the accident?

"Mr. Yost: Dr. Smith will be here.

"Mr. Cole: Will Dr. Wood be here?

"Mr. Yost: No.

"Mr. Cole (Q): What did Dr. Wood tell you? A. He said, 'If you leave your ears alone and nobody bothers them, your hearing will come back to you.'

"Q. What did he say was causing your ear trouble? A. He didn't say.

"Q. Didn't he tell you that you had a catarrhal condition that was causing your ear trouble? A. I don't remember if he did.

"Q. When your deposition was taken at Mr. Eagleton's office the 26th of March, 1935, I will ask you if this question wasn't asked you and this answer given: 'Did Wood ask you, Dr. Wood, ask you to come back? A. No; he said to go home, not treat my ears any more; that I had a catarrhal trouble with my ears.'

"Mr. YOST: I ask the whole answer to be read.

"Mr. COLE: I will read it. 'And he said to get that cleared up to stay out and get plenty of fresh air and take care of my ears, and eat the right kinds of food, that my ears may possibly come back; he said he wouldn't say perfect, but he thought they would come back to where I wouldn't have any more trouble.'

"Q. Did you make that answer to the question I asked you? A. Yes, sir.

"Q. Then Dr. Wood did tell you that you had catarrhal trouble? A. I said I didn't remember.

"Q. Did you tell me when I took your deposition that Dr. Wood told you you had catarrhal trouble with your ears? A. I possibly did. I don't remember.

"Q. Why did you go to Dr. Anderson about your ears? A. He just lived there and would be sitting around talking, and he was eating at the hotel with me."

Dr. James M. Smith testified for respondent (plaintiff), and the material parts of his testimony on the phase of the case here being discussed are as follows:

"Q. You know that he later went to Dr. V. V. Wood? A. Yes.

"Q. When did you learn that? A. Give me the record and I will tell you.

"The WITNESS: In March, 1932, I was confined to bed for seven months, and during that time he went to Dr. Wood for some treatment.

"Q. Was he treated by Dr. Wood? A. Very likely.

"Q. During the seven months? A. I was sick at the time. He came to my house in March, 1932, to consult me, and he went to Dr. Wood after that.

"Q. Dr. Wood is a good ear doctor, too? A. There is no better.

"Q. You don't know what Dr. Wood's conclusions were? A. No, I don't."

During the testimony of Dr. L. C. Boemer, an ear specialist produced by the appellant, the attorney for respondent asked him a hypothetical question and the following occurred:

"Mr. COLE: That does not include all the elements.

"Mr. Yost: I ask that counsel suggest what he would like to have in it.

"Mr. Cole: I suggest that, assuming this man was never discharged by Dr. Smith and that Dr. Smith expected him to come back, but he did not, and assuming that he then went to Dr. Wood and received treatment, seven months of which we know nothing about the treatment.

"Mr. Yost: I object to that as an absolute misstatement of any testimony in this case, and counsel should be reprimanded.

"Mr. Cole: I understood him to say he was treated by Dr. Smith and Dr. Wood.

"Mr. Yost: He stated he went to Dr. Wood a few times when Dr. Smith was away. Dr. Wood is available to you.

"Mr. Cole: He is your doctor.

"The Court: Let's go ahead.

"Mr. Yost: The jury should be instructed to disregard the statement by Mr. Cole, your Honor.

"The Court: I understand that during the illness of Dr. Smith he did go to Dr. Wood.

"Mr. Yost: Yes.

"Mr. Cole: And we don't know how long or how he treated him.

"The Court: Proceed."

On the argument defendant's counsel proceeded as follows:

"Mr. Cole: He went to Dr. V. V. Wood. Where is he? He would know how long this man came to him; what his condition was when he left him, and whether he treated him up to the day before this accident or not. He is their doctor and a man they should have produced.

"Mr. Yost: I object to that, because it is contrary to the testimony, and, in the second place, he is just as available to Mr. Cole or the defendant as he is to the plaintiff. If they thought he could testify to anything that would aid them he was subject to subpoena. First of all, his statement as to when he went to Dr. Wood is a misstatement, and, second, it is incompetent as to the absence of the doctor.

"The Court: Sustained.

"To which ruling of the Court the defendants, by counsel, then and there duly excepted and still except."

█ Defendant assigns error on this ruling. In Winkler v. Railway Co., 321 Mo. 27, 10 S. W. (2d) 649, we stated the rule as follows:

"But the fact that a party to an action fails to call a witness who, under the circumstances of the case, would naturally be a witness in his behalf, may be commented on by opposing counsel. This comment may be to the effect that the failure is evidence of the fact that,

if the witness had been called, his testimony would have been adverse to the party calling him." [2 R. C. L., p. 412, sec. 11].

In Porter v. C., B. & Q. Railroad Co., 325 Mo. 381, 390, 28 S. W. (2d) 1035, we also ruled as follows:

"Defendant strenuously complains because plaintiff did not call as witnesses the doctors who had treated him. His failure to call such witnesses raised a presumption that their evidence would have been unfavorable to him, and such failure on his part was a circumstance to be considered by the jury in determining the *bona fides* of plaintiff's claim. However, since the jury did consider this question before rendering a verdict in favor of plaintiff, it furnishes no ground for setting aside the verdict which is supported by substantial testimony."

Plaintiff concedes the rule but contends that Dr. Wood was equally available to both parties. He argues that the statutory privilege was waived by plaintiff in a deposition taken by defendant six months before the trial. In view of a waiver, he suggests that after the deposition was taken defendant had ample time "to have undertaken to interview and secure a statement from Dr. Wood, and if Dr. Wood refused to give such interview and statement, then appellant (defendant) could have taken his deposition and could have followed up the investigation by subpoenaing Dr. Wood for the trial." Assuming that the statutory privilege was waived, the suggestion is an admission by plaintiff that the doctor was not equally available to defendant as a witness. The relation of physician and patient made him easily accessible to plaintiff, who could freely discuss his injuries with the doctor. Furthermore, plaintiff could not relieve himself of the unfavorable inference that could be drawn from his failure to call the doctor as a witness, by suggesting to defendant during the trial that it could call the doctor as a witness. If defendant had done so, it would have vouched for the doctor's credibility and barred itself of the privilege of cross-examination. [Hasenjaeger v. M., K. & T. Railroad Co., 53 S. W. (2d) 1083, 1087.] The court erred in sustaining plaintiff's objection to said argument.

Plaintiff cites Rothschild v. Barck, 324 Mo. 1121, 26 S. W. (2d) 760. It was an action against the defendant doctor for malpractice. The trial court refused to permit plaintiff to make an argument upon defendant's failure to call the hospital nurses as witnesses, and plaintiff assigned error. It appeared from the record that the nurses were not under control of defendant. On the contrary patients pay the nurses, who are under control of the hospital. The nurses were equally available to plaintiff.

Plaintiff next contends that the evidence was sufficient to sustain the verdict for $10,000 and for that reason the error was not prejudicial.

It is not a question of sufficiency of the evidence. It is a question of a litigant having been denied the right of argument to a jury. There is no way to determine from the record the effect of this ruling on the verdict. It is clear that defendant was entitled to make the argument and have the jury consider same in determining the question of damages. The error was prejudicial, and the judgment should be reversed and the cause remanded. It is so ordered. All concur.