James N. DAVIS, Respondent,

v.

M. R. BALL, Appellant.

No. 22114.

Kansas City Court of Appeals.

Missouri.

Oct. 4, 1954.

Barkley M. Brock, Clinton, E. E. Thompson, Sam Mandell, Kansas City, Popham, Thompson, Popham, Mandell, Trusty & Green, Kansas City, of counsel, for appellant.

Delton L. Houtchens and Vance Julian, Clinton, for respondent.

DEW, Judge.

Plaintiff in this case sued to recover damages for injuries to person and property growing out of a collision with defendant's truck on Missouri Highway 13 on February 29, 1952. Plaintiff received a verdict and judgment for $10,000. Defendant appealed to the Supreme Court of Missouri.

This court was advised by counsel at the oral argument of this appeal that when the appeal was called for oral argument in the Supreme Court, appellant's counsel announced that appellant's only contention on appeal was the excessiveness of the verdict, whereupon that court inquired how much the verdict was claimed to be excessive, to which appellant's counsel replied that about half of it was excessive, and that thereupon the court ordered the appeal transferred to this court. On January 20, 1954, the mandate was issued to the effect that it was "not affirmatively shown that the amount in dispute exceeds the sum of Seven Thousand, Five Hundred Dollars ($7,500.00) exclusive of costs", and ordering the appeal transferred to this court. Defendant in his brief, although claiming that the verdict was the result of bias and prejudice because grossly excessive, and "probably more than twice what it should have been had there been proof of causal connection and permanence", does not ask that the judgment be reversed or the cause remanded but that the judgment be reduced.

At the outset of defendant's statement of the facts in his brief, he states: "We concede that plaintiff made a submissible case on negligence and we make no attack upon his instructions. Our contentions on this appeal are that there was no evidence supporting plaintiff's claims of aggravation, or

his claims of permanency, and we contend that plaintiff's verdict of $10,000 is excessive, and so excessive as to establish bias and prejudice on the part of the jury in favor of the plaintiff and against defendant, and to establish that it was based upon bias, prejudice, passion and sympathy on the part of the jury in favor of plaintiff and against the defendant."

Referring to the defendant's Statement of Facts plaintiff in his brief states: "Respondent feels that appellant has made a rather exhaustive statement of the case and we can accept this statement as far as it goes but we feel that appellant has not mentioned some evidence which is necessary for a fair evaluation of the evidence. In order not to repeat matters covered by appellant's statement respondent will accept the appellant's statement but here set forth only evidence not covered by appellant in their statement which we feel should be considered in addition to matters covered in appellant's statement."

We, therefore, set forth below, the defendant's Statement of Facts: "Mr. Davis was 62 years of age at the time of the accident. He was driving his 1948 Kaiser Frazier automobile south along Highway 13, and was in a curve, to his left when he first saw the Ball truck coming toward him, about 100 feet away. The road was blacktop, and was wet from spitting snow which melted as fast as it was falling. Plaintiff placed the speed of the Ball truck at 55 to 60 miles an hour and stated it was partly over the center line. Plaintiff started to pull off the highway, and the truck turned sideways and skidded, and its rear end struck the left side of plaintiff's car. Plaintiff's neck was jerked and he was knocked out for a few minutes. His head went forward and jerked back. It just snapped and he heard a pop in it. There was no sensation of any pain in his neck right at the time after he gained consciousness. He had no broken bones or skinned places, and so told the highway patrolman who came out shortly after the accident.

"The highway patrolman, Trooper Wayne Allman, testified that he asked Mr. Davis at the scene if he was injured, and that plaintiff said he was not; plaintiff was walking around and Trooper Allman could see no injury and noted that plaintiff apparently had no difficulty in walking, or in moving his head, or talking, that he did not appear in any way dazed or semiconscious, that as far as Trooper Allman could tell, plaintiff appeared to be in complete possession of all his normal faculties and answered all questions asked without difficulty; based upon his experience and judgment, there was about $350 damage to the automobile.

"Mr. Davis drove his car home; after reaching there he noticed that his head and neck were hurting, he took three or four aspirins, and later hooked his tractor up to a lime truck and pulled it around some fields which were awful muddy, he just sat on the tractor and drove it for about a half hour; his pain continued to get worse; the next morning he went down and did some disking, riding his tractor, his neck and head were paining severely; some five days later he went to see Dr. Powell. In the meantime, he had pain in his head and neck, just walked the floor for about four days and did not sleep nights, there was an awful hurting on the back of his neck and his head ached, it was then he decided to go see Dr. Powell. Dr. Powell gave him treatments for two or three weeks; he paid Dr. Powell $12.50 for his services. He did not feel better after his treatment, and he then saw Dr. Barnett, Dr. Powell turned him over to Dr. Barnett; Dr. Barnett treated him for a month or so and plaintiff paid him $48.00 for his treatments. His condition did not improve and he then went to see Dr. Skoog, a Kansas City specialist, where X-rays were taken. He saw Dr. Skoog just once. Dr. Skoog gave him no treatments or medicines; his attorneys recommended that he see Dr. Skoog, it was in April, 1952. Dr. Skoog sent him to Dr. DeWeese, who made X-rays. He paid Dr. Skoog $85.00.

"Next he went to see Drs. Olsen and Wiley, at Appelton City, and was under their care from June to September, 1952, receiving electrical treatments and medi-

cines; he does not know the exact number of times he saw them, but paid them $29.50; his neck pains were relieved while they applied a hot pad to it; the pain in his head and neck got worse and he then went to see Dr. Pipkin, an orthopedic surgeon in Kansas City, in October, 1952, to whom he was referred by his attorneys. Dr. Pipkin gave him a rubber collar to wear; he first saw Dr. Pipkin along in the fall and was told to wear the collar from 12 to 18 months; that Dr. Pipkin gave him some medicine, for which he paid him $38.00. Plaintiff testified that all of the charges made by his doctors were reasonable and just; plaintiff testified that he has worn the rubber collar ever since he got it except at mealtime, and in his home in the evenings, that sometimes he retires wearing it.

"There is a gritting, a painful feeling whenever he moves his head, and he gets relief from wearing the collar, it holds his chin up and braces his neck; there has been no relief from his headache during the time he wears it. The medicine he has been taking doesn't seem to give him any relief as far as his neck is concerned and not much as far as his headaches are concerned.

"Plaintiff testified that he was in good health prior to the accident, and had no pains or difficulty of any kind in his neck region or head. His head aches practically day and night and his neck, and he gets no relief, he doesn't sleep very good and aspirins and medicine have given him no relief.

"Plaintiff is a farmer and had done custom baling, corn picking and combining for others. In 1951 he had 60 head of cattle, but since the accident sold them down to 20, his condition interferes with his care of the cattle and livestock. He has planted less acreage of corn and oats since the accident.

"He sees Dr. Pipkin about every three weeks.

"On cross-examination plaintiff testified that after the collision he got out of his automobile and was walking around, talking with various persons, for about an hour, until he got ready to leave. He was suffering no pain then, but after he stood around there so long a time his head began to ache. He made no complaint of injury to the patrolman or others there who asked if he was hurt. A few days after the accident he put out some oats, riding his tractor, and then he put out some corn on his own place, and some corn on a neighbor's place, he planted quite an acreage of lespedeza and alsyke, and then he cultivated his corn, and in the summer he bought about 55 acres of hay in the field from Ray Johnson, but his boys did the work in putting it up, he just 'pittled around and helped the boys', but did not ride the tractor in baling the hay.

"During the summer of 1952, after the accident, he did some work cutting and baling hay, about two or three acres for a Mr. Gilkey and did some work for a Mr. Fred Rissling, just a few hours there. He rode the tractor and pulled the baler in doing that work. He furnished the baler for putting up some hay for a Mr. Crabtree, but did not ride the tractor, somebody else did the work; there was another man for whom he helped take care of some oats; in September, 1952, he went back and cut the second crop on the Johnson farm, riding the tractor.

"He wears the rubber collar practically all the time, but might have had it off when he attended a basketball game.

"His head did not strike anything in the collision, he did not have a scratch or bruise or anything else on his body any place. Plaintiff's wife testified that after the accident plaintiff came home complaining of a terrible headache and that the back of his neck was hurting him terrible, he didn't sleep hardly any that night, that it continued that way for four or five days, about the fifth of March she got him to go to a doctor; during that time she helped him with some of the chores, she did all the time; the next day he disked in some fertilizer for a few hours; he did not sleep at night; he did not seem to get

better prior to the time he went to see Dr. Pipkin, he was getting worse; that he did little work on the farm, she did the scooping when they sowed corn and oats and grass seed; she drove the tractor at times, she had driven it before; Mr. Davis shows symptoms of a nervous action in his sleep, jerking in his sleep, he did not do so prior to the accident; he complains of pain in his neck and head and would get kind of weak in the legs; he had never made such complaints before; and for the last 25 years was never confined in bed or in a hospital for any illness or broken bones or other causes, his general health was pretty good for his age; their net income for the year 1952, according to a copy of their 1952 tax return, was $1,441; that they had no copies of tax returns for the previous years, but said that for the four previous years it ran from $2,000 to $3,000 a year, her testimony was based on recollection not on records, the records had been destroyed.

"Plaintiff did not offer the testimony of any of the local or neighboring doctors who had examined and treated him. His only medical witness was Dr. Pipkin, who testified in person.

"Dr. Pipkin testified that he was an orthopedic surgeon in Kansas City, Missouri; that he first saw the plaintiff at his office on October 31, 1952; there were complaints that his head and neck ached constantly; his neck was stiff so he could not turn to see how to drive an automobile properly and particularly when he attempted to park. Plaintiff also complained of pains in his chest, of general weakness all over and weakness in his legs and some deafness which had been present for some time, but which plaintiff felt was worse since his accident.

"Dr. Pipkin testified that his examination revealed a well-built and well-developed man for his age of 62 years. Motion of the cervical spine was limited so that he could not forward flex his chin so that it would come to within more that 2″ of the breast plate, right and left lateral flections were limited 50%, extension of the neck was zero and attempted forcing beyond this point became painful. Motions of the lumbar spine were within limits of his age group. A slight curvature of the lower spine was postural and not related to his injury. The leg and nerve tests were negative.

"X-rays of the cervical spine showed the development of bony spurs increasing in prominence continuing down the spine to the seventh cervical vertebra and then most prominent in the next segment. The spurring is a degenerative or osteo-arthritis, or as Dr. Pipkin preferred to call it, osteoarthrosis. The intervertebral discs between the fifth and sixth vertebrae, the sixth and seventh vertebrae and the seventh cervical and first thoracic vertebrae are all thinned. The arthrosis was of long standing and could have been present without pain before the accident of February 29. The thinning of the intervertebral discs was of long standing. * * *.

"Trooper Allman testified that within a month before the date of the trial he went to the home of plaintiff in company with some others, and plaintiff was not then wearing the rubber collar; plaintiff walked out toward the garage without any apparent difficulty.

"Witnesses for the defendant testified that they saw the plaintiff during the summer of 1952 and did not observe that he was wearing a collar, or having any apparent difficulty turning his head or walking. Defendant's witnesses also testified that during the summer of 1952, plaintiff drove his tractor baling hay. Plaintiff operated his tractor spreading lime the day after the accident showing no apparent difficulty in using his neck or any other part of his body. Immediately after the accident plaintiff made no complaint of being injured to the driver of the truck which collided with him and showed no apparent difficulty in walking."

Plaintiff in his additional statement of facts calls attention to evidence tending to prove that the verdict includes damages to his car for which there was proof to the full extent prayed for, $1,000; that there was evidence that the plaintiff had already

paid $513 to various doctors for which recovery was asked; that Dr. Pipkin's estimate of future medication was $1.50 to $2 a day for an indefinite time, allowable under the pleadings; that two witnesses for the defendant for whom the plaintiff did some work after the accident testified that he said he was not able to do the work; that he was suffering pain in his neck and head, but that he would do it as an accommodation to them as neighbors.

The sole point relied upon in defendant's appeal is that the verdict was so excessive as to indicate prejudice, passion and sympathy in favor of plaintiff and against the defendant. Under this allegation is the specification (A) that the plaintiff's evidence showed no causal connection between the accident and the disability claimed by the plaintiff, and no evidence that such disability was permanent. Specification (B) is that a comparison of verdicts in analogous cases shows that the verdict in this case was grossly excessive.

■ The collision is conceded. Defendant's Statement of Facts admits there was evidence that in the impact the plaintiff's "neck was jerked and he was knocked out for a few minutes; that his head went forward and pushed back. It just snapped and he heard it pop"; that shortly thereafter and for the next few days and nights plaintiff suffered severe pain in the head and neck and could not sleep; that his condition grew worse even though he performed some work; that he showed symptoms of nervousness in his sleep, and jerked while asleep, which he "did not do prior to the accident"; that he complains of pains in his neck and head and weakness in his legs, and had never made such complaints before the accident; that his general health had been good for 25 years before the accident; that his deafness grew worse; that his arthritis of long standing became active and painful and might not have caused him any pain had it not been for the accident. Plaintiff's doctor testified that plaintiff would probably have to wear a rubber collar permanently, so far as activity is concerned involving the "spec-

tator attitude", such as sitting and looking, and things involving vibration, driving automobiles and doing certain kinds of farm work; that defendant's medical witness testified regarding plaintiff's arthritic condition a "whiplash certainly could have aggravated this preexisting condition". It appears to us that the causal connection between the accident and the claimed disabilities is supported by the evidence, and that there is substantial proof of permanency of such disabilities.

■ On defendant's specification (B), that the verdict is excessive when compared with analogous cases, many cases were cited by the parties with which to compare the recovery in this case. Defendant cites Larson v. Atchison, Topeka & Santa Fe R. Co., Mo., 261 S.W.2d 111; Baker v. Kansas City Terminal Ry. Co., Mo., 250 S.W.2d 999; Warner v. Terminal R. Ass'n of St. Louis, 363 Mo. 1082, 257 S.W.2d 75; McSkimming v. St. Louis Public Service Co., Mo.App. St. Louis, 257 S.W.2d 176; Harrison v. St. Louis Public Service Co., Mo.App. St. Louis, 251 S.W.2d 348. In none of those cases was property loss or medical expense involved, and in some there was no loss of earning capacity. Plaintiff here sought to recover damages to his automobile in the sum of $1,000 and proved, according to his evidence, a greater sum; and he pleaded and proved the expenditure of $513 in medical expenses. It cannot be determined how much of the $10,000 the verdict of the jury allowed for these items, nor how much for plaintiff's future medical expenses, loss of earning capacity or for his pain and suffering. In view of such facts and further considering the reduction in the purchasing value of money since the cases cited were tried, we are unable to gauge from those cases the reasonableness of the verdict in the present case. It is not shown to our satisfaction that the amount of plaintiff's damages as determined by the jury, established bias and prejudice on the part of the jury requiring this court to disturb the verdict.

Judgment affirmed.

All concur.