**Margie Lee HAMPTON, Plaintiff-Respondent,**

v.

**Eugene C. RAUTENSTRAUCH, Defendant-Appellant.**

**No. 47702.**

Supreme Court of Missouri,
Division No. 1.
July 11, 1960.

Motion for Rehearing or to Transfer to Court en Banc Denied Sept. 12, 1960.

George F. Heege, Clayton (John H. Martin, St. Louis, of counsel), for defendant-appellant.

Charles A. Lee, Jr., St. Louis (William R. Kirby, St. Louis, of counsel), for plaintiff-respondent.

DALTON, Judge.

Action for $25,150 damages for personal injuries and property damage sustained by plaintiff when the automobile she was operating on a public highway was struck from the rear by an automobile operated by defendant. The cause was submitted on primary negligence under the rear-end collision doctrine. See Jones v. Central States Oil Co., 350 Mo. 91, 164 S.W.2d 914. Verdict and judgment were for plaintiff for $10,000 and defendant has appealed. The notice of appeal was filed on June 19, 1959, hence jurisdiction of the appeal is in this Court. Section 477.040 RSMo 1949, as amended by Laws 1959, S.B. 7, § 1.

Plaintiff's evidence tended to show that, on October 14, 1957, while a light rain was falling, plaintiff was driving her 1955 Oldsmobile westwardly in the 7200 block on St. Charles Rock Road, St. Louis County, in a careful and prudent manner, on the north or right-hand side of said highway at 15 miles per hour; and that defendant driving his 1954 DeSoto automobile in the same direction on the same road at a much higher rate of speed approached the plaintiff's automobile from the rear and negligently and carelessly caused and permitted his automobile to collide with the rear of plaintiff's automobile, pushing it forward about a car's length or more and causing plaintiff to sustain a whip-lash injury to her neck and other injuries. Since the assignments of error on this appeal relate only to the admission of evidence, the argument made to the jury and the amount of the verdict, it will not be necessary to further review the facts attending the collision, or the negligence submitted.

For convenience we shall consider appellant's third assignment first. Apellant insists that "the amount of the judgment is excessive and is the result of bias, passion and prejudice against appellant." In determining this issue we shall consider the evidence in a light favorable to plaintiff and to the verdict returned by the jury, since the jury could have so found the facts as a basis for determining the amount awarded. Evidence less favorable or contradictory will be disregarded.

Plaintiff was 35 years old, a married woman with two children. She was on her

way to a luncheon engagement at the home of a friend at the time of the collision. The back bumper of plaintiff's car was pushed into the body of the car damaging the "rear quarter panel and lower trunk panel," so that the car sustained a loss in value of one hundred dollars. At the scene of the collision plaintiff complained to defendant that the collision "jerked her neck" and that her "neck felt a little funny," but she didn't think she was severely hurt. She was able to drive her car and proceeded to the home of her friend, as she had planned, but she "looked very pale and upset," appeared very nervous, had pain in the back of her neck, took codeine for pain and left the luncheon within an hour, without eating, and returned and went to bed. She had difficulty sleeping that night on account of pain and the following morning she could not get up at all. Her right arm and right leg would not move and her husband helped her out of bed, dressed her and took her to Dr. Michaelree, who referred her to Dr. Merenda for X-ray because she complained of pain and stiffness in her back and neck. She described the pain in her right arm as "a slow cramp and then sometimes fast, hard pains all the way down into my fingers." At times her hand felt like she had a lot of needles and pins in it, with tingling in the fingers. On receipt of Dr. Merenda's report, Dr. Michaelree referred plaintiff to Drs. Leydig and Lottes. Plaintiff immediately saw Dr. Leydig because the pain in her neck, back, right shoulder and right arm was so severe it was difficult to move and her neck was stiff. Dr. Leydig examined her and placed her in Lutheran Hospital for some seven days, where her neck was placed in traction. The equipment used was described as "some type of heavy canvas halter type thing around the chin and back of the head and [with] buckles to strap it down tight and it hangs over the back of the bed with weights on that." In addition to neck traction, she was given hypos, therapy and massage treatments. When she left the hospital and went home, she still had difficulty moving her right arm, right leg, right shoulder and neck. She was given a Thomas collar to wear, a high plastic type collar to hold her chin up. At home, she was not able to do her house work. She was directed by her physician to fix up a halter-type traction equipment in the doorway of her home to apply traction to her neck. She was also required to use a heat lamp, a heating pad and an electric vibrator and she continued to receive treatments from Dr. Leydig.

In September 1958, her condition got worse and she was sent back to Lutheran Hospital for about a week, where traction was applied to both legs and she received heat treatment and massages. After September 20, 1958, she still received office treatments from Dr. Leydig, to wit, heat treatment and neck traction. Sometimes the diathermy machine and electric vibrator were applied to her neck, back, arms, shoulder and legs. There were periods of temporary improvement. At the time of the trial she could not put her chin down to her chest, or bring her right arm back of her at the waistline or put it over her shoulder. She was able to work only a short time in the early summer of 1958 in the Tax Assessor's office, first as an extra and then regularly, earning a total of $624. The lifting of the books agitated her right arm and it got worse and caused more pain in her neck, arm and back and she had to quit work and take more traction for her neck and heat and massage treatments for her shoulder and arms.

She cannot iron, clean blinds, wash dishes or attend to many home duties requiring the use of her right arm. At the time of the trial she was using overhead-doorway traction from time to time for her neck and having "to sleep in traction for both legs overnight." This treatment was also referred to as pelvic traction and the equipment as "kind of a corset or girdle type of a thing over the stomach and down both legs, and there are weights over the foot of the bed." The traction treatments do not exceed two hours at a time. After such treatments plaintiff suffers from diz-

ziness and a sick stomach. She does not rest well when leg traction is required and she has to take a lot of tranquilizers.

Plaintiff is still under the care of Dr. Leydig. She has her good days and bad ones. In addition to the use of traction, plaintiff has from time to time worn a back brace or corset to stabilize her back and prevent pain and backache, especially when she is tired. All such equipment was prescribed by Dr. Leydig and is still in use. The movement of plaintiff's head and arm still causes pain.

Dr. Sam Merenda testified that X-rays taken of the plaintiff's neck the day following her injury, showed that the normal curve of the cervical portion of the spine that bows so that the concave is at the back had been lost and it had been "replaced by even a slight angulation pointed in the opposite direction posterior * * * between the fifth and sixth vertebrae." Loss of the normal curve could have been caused by muscle spasm due to pain which pulls the neck down, or to an injury to an intervertebral disc. The X-rays he took of plaintiff's dorsal spine also showed a slight curve to the right, known as scoliosis, a condition such as to make the spine more susceptible to injury.

Dr. Stanley Leydig, when he examined plaintiff on October 17, 1957, found plaintiff pale, nauseated, sick and holding her head in her hands. Any motion of her head or neck caused a great deal of pain, her right arm was almost paralyzed and there was some degree of paralysis in the left arm. Dr. Leydig supervised the treatments which plaintiff received at Lutheran Hospital in October 1957, and he prescribed two types of collars for plaintiff, a felt collar for sleeping and a plastic collar for daytime use. He continued to treat plaintiff at his office through November and December 1957 with heat and traction but he was never able to get the plaintiff's traction up to twenty-five pounds. It would have been desirable to get the traction up to fifty pounds to plaintiff's neck, but this could not be done without causing nausea and sickness. Plaintiff's back and right leg gave her much trouble. In the doctor's opinion plaintiff had suffered an injury to her neck and also a sprain in the lumbosacral area of her back. Dr. Leydig prescribed a corset to support her back. He said that the headaches, of which plaintiff complained, were a normal complaint for this type of injury.

With reference to plaintiff's right arm, Dr. Leydig's opinion was that this condition was caused by torn ligaments in plaintiff's neck that affected some of the fibers that make up the nerve plexus down to the right arm.

At the time of Dr. Leydig's examination in February of 1959, plaintiff was still having trouble and pain in her right arm, with weakness in the grip of her right hand. During his examination of plaintiff's neck he found approximately 10 per cent limitation of motion in all directions; any movement of the head to the left made the neck hurt particularly worse. Plaintiff still had muscle spasm in the right side of her neck above the shoulder, although she had received approximately 60 to 70 traction and heat treatments in Dr. Leydig's office in addition to her treatments at the hospital.

While good results are obtained through traction in 85 per cent of such cases, Dr. Leydig stated that this particular patient appeared to be among the 15 per cent that would not recover and he didn't think she was going to recover. He said that she would have pain in the future for an indefinite time; and that her injuries were permanent and would restrict her in most all of her daily activities. At the time of Dr. Leydig's last examination he found her percentage of permanent disability to be "50% of the person as a whole" and that such was the only rating he would give her.

Dr. Robert J. Mueller examined plaintiff on July 19, 1959, and found some restriction of movement in the right leg and tenderness over the upper thorasic and cervical

spine. His diagnosis was a whiplash injury to her neck with secondary brachial plexus neuritis of the right arm. His findings were in keeping with other whiplash cases where the normal lordotic curve of the cervical spine had been replaced with kyphosis. Dr. Mueller was of the opinion that the plaintiff would have future pain in her neck and in her right arm; and that the conditions he found there were of a permanent nature.

Appellant briefly summarizes the evidence concerning plaintiff's injuries and insists that this record does not show injuries sufficiently serious to justify a judgment for $10,000, especially since there was no substantial loss of earnings or other special damages and the property damage was of a nominal amount. Plaintiff's evidence shows that she had to give up a position paying $300 per month. This evidence was sufficient to show a substantial loss of wages. Appellant says "the award in the instant case shows that it must have been the result of bias, passion and prejudice against this appellant, and that it is so excessive that it should not be permitted to stand." Appellant cites Baker v. Kansas City Terminal Ry. Co., Mo.Sup., 250 S.W.2d 999; Warner v. Terminal Railroad Ass'n of St. Louis, 363 Mo. 1082, 257 S.W.2d 75; Davis v. Ball, Mo.App., 271 S.W.2d 605.

In the Baker case, the plaintiff was injured on April 25, 1948, and the opinion states that "plaintiff was hospitalized for 16 days; he was away from work 90 days; he had no loss of wages, hospital or medical expense; he worked for about 60 days immediately following the injury and has been working continuously (except for occasional days missed due to pain) since the expiration of the 90-day period at a job requiring more physical exertion than did his job at the time of injury; no impairment of earning capacity was shown; he suffers pain in his back, neck, shoulder, and arms; he has headaches; he has trouble in holding onto packages; he will continue to have pain from an aggravation of a pre-existing arthritic condition." (250 S.W.2d 999, 1007.) Verdict and judgment was for $10,000 and a $2,500 remittitur was required.

In the Warner case the jury's award of $8,500 was not reduced and it does not appear that an even larger verdict would not have been approved. The same is true in the Davis case where a $10,000 verdict was not reduced.

Each case must be considered upon its own peculiar facts and we have so considered this case. We have taken into consideration all of the usual matters for consideration in a case where the verdict is claimed to be excessive. Brown v. Payne, Mo.Sup., 264 S.W.2d 341, 348; Roderick v. St. Louis Southwestern Ry. Co., Mo.Sup., 299 S.W.2d 422, 429.

It is unnecessary to further review the evidence on the issue of damages. The amount of the award does not in our opinion show any bias or prejudice on the part of the jury against the defendant, nor do we find the verdict excessive. Riggs v. Metcalf, Mo.Sup., 315 S.W.2d 791; McCaffery v. St. Louis Pub. Ser. Co., 363 Mo. 545, 252 S.W.2d 361, 368. The assignment is overruled.

■ Appellant assigns error on the admission in evidence of plaintiff's Exhibits 6, 7 and 8, to wit, a Thomas collar, a back brace or corset and a pelvic traction brace, "for the reason that such exhibits, in themselves, had the effect of unduly prejudicing the jury against appellant, and had the effect of unduly arousing the jury's sympathy for respondent."

Prior to the admission of these exhibits and out of the hearing of the jury, plaintiff's counsel advised the court that he wanted the exhibits marked for identification purposes and to have plaintiff identify them and testify that she used them; that he then wanted to introduce the exhibits into evidence and lay them on the counsel table; and that they would not be passed to the jury. He said there would be no personal demonstration in court as to

how they were used by plaintiff. Defendant's counsel objected on the ground that "it incites sympathy and prejudice"; and that "it is an exhibition like a bloody shirt" and its purpose "is to augment the size of the verdict beyond its reasonable proportion." The objection was overruled.

Plaintiff testified that, after she was injured, Dr. Leydig prescribed a Thomas collar for her use. We do not find that she described it at any time, but counsel referred to it as "a high plastic type collar to hold your chin erect." She identified the Thomas collar and referred to it as a daytime collar (Exhibit 6) which she wore every day for two or three months and she still wears it part of the time, as needed, when her neck hurts. She also had a somewhat similar collar to sleep in after she first came home from the hospital. Exhibit No. 7, the back brace or corset was prescribed by Dr. Leydig and it was adjusted to fit. She put it on after she was in the hospital the first time and wore it until she went to the hospital the second time and for a while after she left the hospital the second time. She still wears it on occasions for backaches and on evenings when she is very tired.

Exhibit No. 8 was referred to as a leg traction and as a pelvic traction. It was described as "a girdle or corset type of thing over the stomach and down both legs for use with weights over the foot of the bed." It was prescribed by Dr. Leydig and purchased from the Aloe Company. She had "to sleep in traction for both legs overnight" and was using the device "all night every night" at the time of the trial. When the exhibits were finally offered in evidence defendant's counsel again objected on the ground "that they tend to incite prejudice and passion on the part of the jury in themselves." Counsel also moved "for a discharge of the jury on the grounds of prejudicial demonstrations and exhibitions of the exhibits * * * for the purpose of inciting passion, influence and prejudice in this case." The motion did not prove itself, nor show that any demonstrations were made. There is nothing in the record to show that counsel for plaintiff did not proceed exactly in accordance with his prior statement to the court, as made in the absence of the jury. The motion and objections were overruled and the exhibits admitted.

Appellant insists that "Exhibits 6, 7 and 8 *served no valid purpose,* they did not add to the knowledge of the jury in any way and they did not illustrate any of the injuries which *the doctors* and plaintiff stated she had sustained." (Italics ours.) Appellant refers at length to the medical testimony concerning the purpose and use of these exhibits and why they were used, to wit: the Thomas collar, "to relieve pressure on the nerves in the neck and shoulder area"; the back brace, "to immobilize the back * * * to relieve pressure on nerves and stretching of soft tissues of nerves and ligaments"; and the pelvic traction brace, to provide traction "to the lower portion of the back or to the pelvic area * * * to relieve pressure and to relieve pain in that area." Counsel overlooks the fact that the medical testimony relied upon to show that it was unnecessary to admit the exhibits in evidence and that they served no useful purpose was not in the record when the exhibits were offered and received in evidence. Appellant, however, further argues that: "Orthopedic appliances such as these exhibits will, by their very nature, excite the viewer to sympathy for the wearer, and will inflame the minds of the average juryman against the defendant, regardless of any other circumstances in the case."

Appellant argues that the trial court abused its discretion in "permitting the introduction of the Exhibits * * * and permitting them to be in view of the jury and to be referred to by the witnesses * * *." Appellant cites Glowacki v. Holste, Mo.Sup., 295 S.W.2d 135, 141; Faught v. Washam, Mo.Sup., 329 S.W.2d 588, 560. Neither case supports appellant's position. In the Glowacki case the court held that the admission in evidence of a Thomas

cantilever leg brace worn by plaintiff for some five months and which caused additional discomfort, pain and inconvenience was not of the type of surgical appliance which would have had the effect to "prejudice the jury against the defendant or unduly arouse the jury's sympathy for plaintiff"; [295 S.W.2d 141] and that no abuse of the court's discretion in the admission of such evidence was shown. In the Faught case the court considered the admission in evidence of six colored photographs depicting sympathy-provoking injuries in "high and unrealistic colors" [329 S.W.2d 600] and held that 'their probable inflammatory and prejudicial effect far outweighed their potential evidentiary or probative value." Appellant concedes that "generally, the introduction of demonstrative exhibits lies within the sound discretion of the trial court," and such is the rule in this state. Evans v. General Explosives Co., 293 Mo. 364, 239 S.W. 487, 493(16); Brock v. Gulf, M. & O. R. Co., Mo.Sup., 270 S.W.2d 827, 833; Carlson v. Kansas City, Clay County & St. Joseph Auto Transit Co., 221 Mo. App. 537, 282 S.W. 1037, 1040; 32 C.J.S. Evidence § 602, p. 454.

We do not consider the exhibits inflammatory or offensive or to be such as would "unjustly arouse sympathy for the plaintiff." The use of the exhibits in question was considered necessary to the proper treatment of plaintiff's injuries. Their use caused plaintiff to suffer additional discomfort, pain and inconvenience. Plaintiff was entitled to show how her injuries were treated by her physician and the effect of such proper treatment upon her. The exhibits were important items of evidence, relevant to the issue of damages and quite necessary to a clear understanding of the construction of the appliances and to explain their use at the time they were offered and received in evidence. The exhibits were informational, they made the oral descriptions more intelligible and contributed to a better understanding of plaintiff's injuries and the treatment required. On the facts shown by this record no abuse of the court's discretion appears. Glowacki v. Holste, supra; Lynch v. Baldwin, Mo.Sup., 117 S.W.2d 273, 276; Holzemer v. Metropolitan St. Ry. Co., 261 Mo. 379, 169 S.W. 102, 109; Golian v. Stanley, Mo.Sup., 334 S.W.2d 88, 94. And see West v. Morgan, 345 Pa. 61, 27 A.2d 46, 47; Smith v. Ohio Oil Co., 10 Ill.App.2d 67, 134 N.E.2d 526, 530, 58 A.L.R.2d 680; Evans v. Roberts, 172 Iowa 653, 154 N.W. 923, 927(6, 7). The assignment is overruled.

Appellant further contends that the trial court committed prejudicial and reversible error in permitting plaintiff's counsel to state, over objection by defendant that plaintiff's physician was equally available as a witness for defendant. To rule this assignment a further statement of the facts is required.

After plaintiff had testified at length concerning the extent of her injuries sustained in the automobile collision of October 14, 1957, she was asked by her counsel if she had ever previously been involved in an automobile collision. She testified that sometime in 1953, she was in an automobile accident; that she hit the left side of her face, her temple and jaw on the steering wheel; that the injuries sustained were primarily to her jaw and temple; and that she went to see a physician as a result of her injuries, but was not hospitalized. On cross-examination, she testified that she received a settlement of these injuries in the sum of $1,000 to $1,200; that she was treated by Dr. Frank J. Manganaro; and that he referred her to Dr. Sam Merenda, who took X-rays. Plaintiff admitted that she had complained to Dr. Manganaro about nervousness and headaches as a result of the injuries sustained, but not of her neck or back. Thereafter, the defendant produced and offered in evidence four X-ray films taken by Dr. Merenda of plaintiff's cervical vertebrae in 1954, subsequent to the December 1953 accident.

In his argument to the jury defendant's counsel said that plaintiff had not produced the X-rays taken after her first automobile accident. He said: "They

were not produced by the plaintiff in this case * * * but I * * * with some difficulty, had those X-rays brought in." He argued that these X-rays must have been taken because of neck and back complaints in 1953, and that defendant's witness, Dr. Leo A. Will, had testified that these X-rays showed a normal cervical spine, no fractures or bone pathology.

Thereafter, during plaintiff's closing argument, the following took place:

"Mr. Lee: * * * Now, this plaintiff honestly told you about an accident in '52 [sic] and had she been seriously hurt, had there been any permanent injuries—they know there were no permanent injuries, serious injuries, or they would have had Dr. Manganaro here. Dr. Manganaro is—that doctor that was six years ago, he is available to Mr. Heege as well as to me.

"Mr. Heege: I object to any reference as to failure of bringing in Dr. Manganaro. He is equally available under subpoena to both parties. I ask the court to instruct the jury to disregard that remark.

"The Court: The jury heard the argument of counsel. As I recall it, he ended up by saying he is available to both sides. At least I will caution the jury this is argument and is not evidence, as you already know. The evidence you heard from the witness stand."

No further request for relief was asked.

Appellant now contends that, "Under the facts of this case, appellant was entitled to comment upon and draw an inference unfavorable to respondent by reason of her failure to produce Dr. Manganaro to deny that there was any complaint or claim of injury to the neck or cervical vertebrae in the December, 1953 accident." Appellant says: "The statement of the court below further compounded the damage, for by its comment the court gave approval to respondent's statement that the doctor was

equally available to appellant and could have been produced by appellant and thus completely negatived the unfavorable inference to which appellant was entitled by reason of respondent's failure to produce her physician, Dr. Manganaro. * * * Appellant respectfully maintains and submits that Dr. Manganaro, respondent's physician, was not 'equally available' to him, and the court committed prejudicial error by permitting respondent to state that the doctor was equally available and thus destroy the inference on non-production of the doctor to which appellant was entitled." This argument overlooks the fact that appellant at no time sought to draw the mentioned adverse inference against respondent. Appellant cites Trzecki v. St. Louis Pub. Ser. Co., Mo.Sup., 258 S.W.2d 676, 678; and Eickmann v. St. Louis Pub. Ser. Co., Mo.Sup., 323 S.W.2d 802, 808.

Clearly, Dr. Manganaro, plaintiff's physician, was not equally available to the defendant. However, the burden did not rest upon plaintiff to show that she was *not* injured in 1953. She had testified at length with reference to the extent of her injuries sustained in 1957. The burden to show the injuries now claimed were, in fact, sustained in 1953 rested upon the defendant and it would not have been error for plaintiff's counsel to comment upon the absence of evidence to sustain a point as to which defendant had the burden of proof. State ex rel. Kansas City Pub. Service Co. v. Bland, 325 Mo. 505, 30 S.W.2d 445, 446 (1-3). However, plaintiff's counsel did not stop with such a suggestion as to burden of proof, but specifically said that plaintiff's 1953 doctor was equally available to defendant.

This is not a case like McInnis v. St. Louis-Southern, 341 Mo. 677, 108 S.W.2d 113, where the court committed prejudicial error in denying defendant's counsel the right to comment on plaintiff's failure to call one of her own doctors who was not equally available to defendant as to plaintiff. Here plaintiff sought to draw an inference against defendant for defendant's

failure to call a witness to support defendant's theory that the injuries now sued for by plaintiff were in fact sustained in the prior accident. The witness was the physician who had treated plaintiff after her first accident. As stated, the inference was sought on the theory that the physician, who treated plaintiff after the first accident, was equally available to defendant. However, the only relief asked at the time was that "the court instruct the jury to disregard the remark." Defendant made known to the court the action which he desired the court to take, but not "his grounds therefor." See Supreme Court Rule 79.01, V.A.M.R. The statement by defendant's counsel that, "He *is* available *under subpoena* to both parties," (Italics ours) was confusing and did not assign a proper ground for the relief requested, to wit, "to disregard that remark." The court did not comply with the request, nor directly overrule it. The court did recognize the objection and caution the jury that this was *argument* and not *evidence*. No objection was made to this comment by the court and, apparently, counsel was satisfied with the action taken, since no further relief was asked. Marler v. Pinkston, Mo. Sup., 293 S.W.2d 385, 387. We think the facts here are such that a waiver can be inferred and that no prejudicial error appears from the record. The matter was raised in the motion for a new trial. Apparently the trial court considered the matter as having no bearing on the outcome of the case and such is our view. Burow v. Red Line Service, Inc., 343 Mo. 605, 122 S.W.2d 919, 921 (4, 5). The assignment is overruled.

The judgment is affirmed.

All concur.

#### On Motion for Rehearing

PER CURIAM.

■  Appellant's motion for rehearing re-argues the last point ruled in the opinion and insists that the opinion concedes it was "error for a party to comment upon the absence of a witness at the trial which the party could have called himself." Appellant further argues that "a party should not *withhold evidence* from the jury which was available to him and then comment upon the failure of the adverse party to call such a witness." We fully agree, but find no improper withholding of evidence in this case. The burden rested upon defendant to show that plaintiff's injuries were sustained in a prior accident.

Appellant has cited two additional cases: Johnson v. St. Louis Public Service Co., 363 Mo. 380, 251 S.W.2d 70, 74, and Lix v. Gastian, Mo.App., 287 S.W.2d 354. More than one error was considered in each of these cases. These cases have little in common with the factual situation presented in the present case. They do not aid us in determining the issues presented here. In neither case was there any action taken in ruling the objection or request made by counsel, other than to overrule it, and in neither case was defendant contending that the injury complained of had been sustained at some other time than the time relied upon by plaintiff, nor had the witness referred to treated plaintiff for such prior injury.

Appellant further says that "the action taken by the trial court was not only feeble and ineffective but was a back-handed approval." We think the action taken by the court in an apparent effort to act upon the request and grant some relief to defendant was sufficient to require defendant to either renew the objection after the ruling, make a request for further relief or object to the remarks of the court in order to avoid a waiver of the original objection on the ground that apparently counsel was satisfied with the action taken by the court. And why did defendant's counsel join with his objection the statement, "He (the mentioned witness) is equally available under subpoena to both parties"? The statement did not tend to sustain an objection to the argument about Dr. Manganaro, nor was it a basis for counsel's

request. Apparently it confused the trial judge and, if there was any prejudice to defendant, this statement of his own counsel may have caused such prejudice.

In any event, not every error occurring in the trial of the cause is prejudicial and reversible and, under the facts and circumstances shown by the record in this case, whether the mentioned error was prejudicial to defendant was a matter properly within the trial court's discretion and, since the trial court overruled defendant's motion for a new trial, which motion had fully presented this particular error, we should not disturb the trial court's conclusion that no prejudice resulted. The motion for a rehearing is overruled.